IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ENTERPRISE RENT-A-CAR | ) | MDL No. 2056 |
| WAGE & HOUR EMPLOYMENT | ) | |
| PRACTICES LITIGATION | ) | Misc. No. 09-210 |
| | ) | |
| | ) | Civil No. 07-1687 |
| NICKOLAS HICKTON, *et. al.*, | ) | Civil No. 09-0815 |
| | ) | Civil No. 09-0816 |
| Plaintiffs, | ) | Civil No. 09-0824 |
| | ) | Civil No. 09-0832 |
| v. | ) | Civil No. 09-0833 |
| | ) | Civil No. 09-1188 |
| ENTERPRISE RENT-A-CAR | ) | Civil No. 09-1321 |
| COMPANY, *et. al.*, | ) | Civil No. 10-1003 |
| | ) | Civil No. 10-1189 |
| Defendants. | ) | Civil No. 10-1456 |
| | ) | Civil No. 11-0071 |
| | ) | Civil No. 11-0333 |
| | ) | Civil No. 11-1024 |
| | ) | Civil No. 12-0659 |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| Hickton v. Enterprise Rent-A-Car | ) | |
| Company, Civil No. 07-1687 | ) | |
| | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

*I. Introduction*

    This opinion concerns sample plaintiff Nicholas Hickton ("Hickton").  Pending before

the court are eight motions for summary judgment filed by the relevant operating subsidiaries

(collectively "defendants") of former defendant Enterprise Rent-a-Car Company ("ERAC")

against sample plaintiffs[1] selected from the cases consolidated in this multidistrict litigation

---

[1] The following individuals were selected as sample plaintiffs: Robert Bajkowski; Joseph Biski; Wayman F. Graham
II; Kevin C. Hagler; Nils Hagstrom; Nickolas C. Hickton ("Hickton"); Melinda McQuaig (formerly, Melinda
Herrin); and Brandon Singleton.

("MDL").  The consolidated cases involve allegations that defendants violated the compensation requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay plaintiffs overtime compensation.   Plaintiffs are or were assistant managers employed by one of the defendants.

This memorandum opinion addresses the motion for summary judgment filed by defendant Enterprise Rent-A-Car Company of Pittsburgh, LLC ("ERAC-Pittsburgh"), a subsidiary of ERAC, against Hickton.  (ECF No. 346.)[2]  Hickton originally also claimed that he was improperly classified as exempt when he was a branch manager at ERAC-Pittsburgh (in addition to the time he was an assistant manager), but he later withdrew the claim with respect to his employment as a branch manager.  This opinion, therefore, will only consider his employment as an assistant manager and the time period during which he was an assistant manager.

ERAC-Pittsburgh argues that when Hickton was an assistant manager he qualified for the executive, administrative and combination exemptions from the compensation requirements of the FLSA.  Hickton responds that summary judgment would be improper at this stage because there are genuine disputes of material facts concerning whether the "narrowly construed" FLSA exemptions are applicable.  ERAC-Pittsburgh argues that no dispute is genuine because plaintiffs submitted declarations that violated the "sham affidavit" doctrine in an attempt to fabricate disputes of fact.  In response, Hickton argues that the sham affidavit doctrine is not applicable and that certain of the declarations filed in support of the motion for summary judgment were

---

[2] Unless otherwise indicated, all references in this opinion to CM/ECF electronic document filing numbers are made with reference to the MDL master docket, filed under the miscellaneous case number 2:09-mc-210.

submitted in violation of Federal Rule of Civil Procedure 26. Each of those arguments will be addressed.

After an extensive review of the parties' submissions, the hearing transcript of the oral argument and the applicable legal principles, the court concludes that in light of the summary judgment standard of review and the narrowness of the FLSA exemptions, ERAC-Pittsburgh failed to satisfy its burden of proving as a matter of law that Hickton was properly classified as exempt as an assistant manager. The motion for summary judgment filed by ERAC-Pittsburgh against sample plaintiff Hickton will be DENIED.

## *II. Factual Background*

Hickton was hired by ERAC-Pittsburgh on August 11, 2003. (Hickton JCS (ECF No. 432) ¶ 3.) He was hired as a nonexempt management trainee at a branch in Pleasant Hills, Pennsylvania (the "Pleasant Hills branch") and a satellite office in a car dealership. (Id. ¶¶ 4, 6.) On April 19, 2004, while still a management trainee, Hickton transferred to ERAC-Pittsburgh's branch at the Pittsburgh International Airport (the "airport branch"). (Id. ¶ 5.) On August 1, 2004, Hickton became a management assistant at the airport branch. (Id. ¶ 8.) On November 1, 2004, ERAC-Pittsburgh promoted Hickton to an assistant manager at the airport branch. (Id. ¶ 12.) On March 7, 2006, he was promoted to branch manager of ERAC-Pittsburgh's branch in Steubenville, Ohio. (Id. ¶ 49.) This opinion concerns the employment of Hickton as an assistant manager during the period of time between November 2004 and March 2006.

Hickton declared that his primary responsibility while an assistant manager was writing tickets and renting vehicles. (Hickton Decl. (ECF No. 305, Ex. B) ¶ 12.) He wrote at least twenty-five rental tickets each day. (Id.) He also cleaned and moved cars and picked up customers. (Id. ¶¶ 21-23.)

ERAC-Pittsburgh encouraged its employees to take initiative and exhibit independence in their responsibilities.  (Hickton Dep. (ECF No. 352-2) at 6.)  As an exempt management trainee, Hickton's job duties required him to "[a]nswer the phone, take reservations, pick customers up, drop customers off, work on accounts receivable with some of the local dealerships[, which meant] making sure that we were collecting money on rental contracts  that they owed us, [and to conduct] normal day-to-day operational functions, [such as] cleaning cars."  (Id.)  Hickton recalled that these job responsibilities required little if any oversight because he had received training prior to arriving at the Pleasant Hills branch and because these responsibilities were "self-explanatory."  (Id. at 6-7.)

More important and potentially discretionary issues which ERAC-Pittsburgh employees were required to make—such as the proper qualifications for renting cars—were dictated by policy, and nonexempt employees were empowered to make decisions on those issues, as long as pre-established criteria were met.  (Id. at 37.)  For example, policy dictated whether a customer met the qualifications to pay with cash or a debit card.  (Id.)  The branch manager had the authority to deviate from company-wide policies.  (Id. at 40.)  For example, at the airport branch, the branch manager established the policy that only assistant managers or the branch manager should conduct "call-backs," but management trainees and management assistants were empowered to perform call-backs according to ERAC-Pittsburgh policy.  (Id.)  The term "call-backs" refers to the branch's method of keeping track of outstanding vehicles and ensuring timely payment had been made; the term could imply calling the customer to check in on the status of the rental or simply marking in the computer system that a return was expected on a specific day.  (Id. at 40-41.)  Hickton declared that "[t]he general operation of each branch . . . was set forth in highly detailed manuals supplied to all branch employees . . . [which] approved

responses to situations encountered during the normal course of branch operations" and that he did not develop these policies or procedures, but was required to follow them. (Hickton Decl. (ECF No. 305, Ex. B) ¶¶ 16-18.)

In August 2005, Hickton's branch manager reviewed his performance as an assistant manager. (Hickton Review (ECF No. 352-10).) Hickton completed a portion of his employee performance evaluation where he indicated the percentage of time each week spent on various "management duties":

    (A) MANAGEMENT OF CUSTOMER SERVICE . . . 100%[;]

    (B) HUMAN RESOURCE MANAGEMENT . . . 100%[;]

    (C) SALES AND MARKETING . . . 90%[;]

    (D) BRANCH ACCOUNTING . . . 50%[;]

    (E) FLEET MANAGEMENT . . . 100%[;]

    (F) MANAGEMENT OF BRANCH SAFETY, SECURITY, MAINTENANCE, AND APPEARANCE . . . 100%[; and]

    (G) OTHER . . . [uncompleted] %[.]

(Id.) Below that section of the self-evaluation, Hickton wrote, "[m]y reasoning for not equating this section with a grand total of 100% is because I am constantly doing multiple things. Multitasking is a very important asset to my successes." (Id.) Hickton affirmed that he multitasked as an assistant manager during his deposition. (Hickton Dep. (ECF No. 352) at 16.)

Hickton did not remember filling out the 2005 self-evaluation and at his deposition he specifically denied performing many of the tasks which fell within the categories listed on the sheet. (Id. at 14.) For example, he testified that he did not select or recommend job candidates, delegate and share responsibilities, follow up on delegated assignments, or investigate and

resolve employee issues and complaints. (Id.) He did not have the authority to hire or fire employees, and did not make recommendations about potential candidates. (Id. at 50, 53-54.) He did not remember giving guidance or instruction to ERAC-Pittsburgh employees during the workday. (Id. at 38.) He did, however, admit that he "supervis[ed]" employees at the airport branch and that he approved employee time entries at the end of the day when he worked the evening shift. (Id. at 42, 47.) He testified that maintaining the proper mix of vehicles (*i.e.*, SUVs as opposed to sedans) in the branch's inventory was exclusively the responsibility of the branch manager at the airport branch. (Id. at 41.) Hickton denied having the authority as an assistant manager to discipline employees, but he did provide informal warnings to employees who, for example, had a history of tardiness. (Id. at 15, 43.) Hickton admitted that he trained and motivated employees. (Id. at 16, 21.) For example, he testified to the accuracy of his self-evaluation assessment that "training never ends" and "[o]n a daily basis I teach customer service techniques, as well as prepare my employees for their skills test and MQIs." (Id. at 17.) Hickton's review indicates that he was the "Branch Corporate Account Manager" at the airport branch, which required him to try to increase business at the branch through marketing efforts and developing new accounts. (Id. at 17.)

Hickton did not participate in prospective employee interviews while he was an assistant manager. (Id. at 22.) Even as a branch manager, he only sat in on two interviews, and he had no input into the hiring decision. (Id.) He described himself, even as a branch manager, as a "spectator" to the hiring process, who may or may not be present during an interview. (Id.) According to the declaration of George Penrod ("Penrod"), who was the branch manager at the airport branch when Hickton was an assistant manager, the airport branch was staffed through the "Best Employee Program," which meant that management assistants and management

trainees were not hired directly to work at the airport branch. (Decl. of George Penrod ("Penrod Decl.") (ECF No. 352-4) ¶¶ 7-8.) Instead, they were selected from the best performers at other ERAC-Pittsburgh branches. (Id.) Under that program, ERAC-Pittsburgh's human resources personnel would compile and email to Penrod a list of eligible employees' sales data. (Id. ¶ 8.) Penrod, in turn, would call the prospective employees whom he selected, invite them to visit the airport branch, and interview them. (Id.) Penrod declared that Hickton made recommendations about transferring employees as part of the "Best Employee Program" based upon his having worked in other branches with some of the eligible employees. (Id. ¶ 17.) Penrod claimed he gave those recommendations weight. (Id.) Penrod also declared that Hickton recommended a particular employee be transferred out of the airport branch for poor performance, and that Penrod acted on that recommendation. (Id. ¶ 18.) Hickton did not recall whether that happened when questioned about the specific employee during his deposition. (Hickton Dep. (ECF No. 352-2) at 35.) He declared that he occasionally had informal conversations in which he gave his opinion about an individual, but that Penrod asked all employees for input, and Hickton did not believe his suggestions were given particular weight. (Hickton Decl. (ECF No. 305, Ex. B) ¶¶ 29-31.)

According to Penrod, Hickton was one of four assistant managers at the airport branch, and he was assigned his own team of three to four management trainees or management assistants, which he supervised. (Penrod Decl. (ECF No. 352-4) ¶ 4.) Hickton, on the other hand, denied delegating tasks. (Hickton Dep. (ECF No. 352-2) at 14.) He testified that the nonexempt employees did not need any meaningful direction: "The process is so simple that [giving direction is] really not necessary. . . . It's just you do the same thing a hundred times a day. Everybody knows what to do, and it gets done." (Id. at 26.) He declared that he did not set

schedules or apportion tasks among employees, but that management trainees and management assistants carried out their functions without his direction. (Hickton Decl. (ECF No. 305, Ex. B) ¶¶ 46-47.)

Hickton occasionally worked during evening hours, when neither Penrod nor other assistant managers were present at the airport branch. (Hickton Dep. (ECF No. 352-2) at 34.) He worked weekends occasionally, but Penrod or another assistant manager were often there on weekends as well. (Id.) When Hickton worked the evening shift, the branch was staffed by only four employees, including him, who were split between two locations (a drop-off location and a pick-up location). (Hickton Decl. (ECF No. 305, Ex. B) ¶ 25.) If an important decision needed to be made when Penrod was away from the branch, Hickton was required to call Penrod and obtain his approval and guidance about the appropriate course of action. (Id. ¶ 26.) Hickton's authority to make unimportant decisions was the same as any other employee when the branch manager was not present, and as was explained above, was largely controlled by branch or corporate policy. (Id. ¶ 27.)

When Hickton became an assistant manager, he was given keys to the airport branch and the combination to the branch's safe. (Id. at 32-33.) He had new authorization to run specific reports on the branch's computer system, but his actual access to the reports did not increase because they had always been accessible and available in the branch in hard copy format. (Id. at 33.)

As an assistant manager, Hickton was paid a salary plus a percentage of the branch profits. (Hickton JCS (ECF No. 432) ¶ 12.) Hickton's total compensation in 2005 amounted to $37,255. (Id.) During the same time period, management trainees annually earned between approximately $25,000 and $28,000. (Lansberry Decl. (ECF No. 352-3) ¶ 14.) Management

assistants earned between approximately $27,000 and $30,000 annually during the same time period.  (Id.)

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

<u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>Doe v. Abington Friends Sch.</u>, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing <u>Celotex Corp.</u>, 477 U.S. at 322-23; <u>Anderson</u>, 477 U.S. at 248)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). The court must rely on the substantive law to identify which facts are material. <u>Abington Friends Sch.</u>, 480 F.3d at 256 (citing <u>Anderson</u>, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001); <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### IV. Discussion

The FLSA is a federal statute, originally enacted in 1938 and designed to combat substandard labor conditions relating to unfair wages, overlong working hours and a variety of other perceived evils. At issue in this motion for summary judgment are some of the myriad exemptions to the FLSA's overtime requirements. Specifically, ERAC-Pittsburgh claims that Hickton was exempt from the FLSA's compensation requirements under one of the following exemptions: 1) executive; 2) administrative; or 3) combination.

As a preliminary matter, before addressing the substantive arguments relating to FLSA exemptions, the court will address the two secondary arguments presented by the parties. First, ERAC-Pittsburgh argues that Hickton submitted a sham affidavit after his deposition, which this court should disregard in assessing the existence of genuinely disputed material facts. Second, Hickton argues that ERAC-Pittsburgh failed to disclose the identity of witnesses whose statements were attached to its motion for summary judgment, in violation of Rule 26 of the Federal Rules of Civil Procedure.

### A. Sham Affidavit Doctrine

ERAC-Pittsburgh asserts that Hickton submitted a "sham affidavit." Under the "sham affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'" Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 679 (3d Cir. 2006) (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see, e.g., Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007) (holding that to permit the plaintiffs to engineer factual disputes by means of self-serving affidavits "'would

greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'" (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969))); Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231, 2008 U.S. Dist. LEXIS 70026, at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment based on employee's "performance evaluations . . . , her contemporaneous reporting of her job responsibilities, [her] resume, and her deposition testimony"), adopted by Memorandum Opinion, Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231 (W.D. Pa. Apr. 7, 2008).

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez, 503 F.3d at 253. Because the trial court is vested with the inherent power to grant summary judgment on disputed records, Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary weight to an affidavit that is clearly offered solely for the purpose of defeating summary judgment. Jiminez, 503 F.3d at 253. The practical underpinning of the sham affidavit doctrine "is that prior depositions are more reliable than affidavits." Id.

In Jiminez, the Court of Appeals for the Third Circuit recognized that other courts of appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent affidavit contradicts prior deposition testimony, it should be disregarded." Id. at 254. The Court of Appeals for the Third Circuit has "adopted a more flexible approach." Id. The court recognized in Jiminez that "not all contradictory affidavits are necessarily shams." Id. Notably, "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." Id. (quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004)). "Such corroborating evidence may

establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the affiant should have the opportunity to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit.  Id.; see Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents.  See Lytle v. Capital Area Intermediate Unit, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting Baer, 392 F.3d at 625)).  To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ." Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).  When allegations in a subsequent affidavit could support statements made in prior deposition testimony, the dueling statements "are more appropriately dealt with on cross-examination than on summary judgment."  Ragan v. Fuentes, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J. Sept. 28, 2007).

Hickton was deposed on August 28, 2008 (Hickton Dep. (ECF No. 352-2) at 1), and submitted a declaration dated May 7, 2009 (Hickton Decl. (ECF No. 305, Ex. B)).[3] ERAC-Pittsburgh points to alleged inconsistencies between the declaration and Hickton's deposition testimony, which will be discussed below in order.

First, ERAC-Pittsburgh argues that portions of paragraph 43 of Hickton's declaration are inconsistent with his prior deposition testimony. In paragraph 43, Hickton declared that "the Area Manager was ultimately responsible for managing the branch and employees of the branch." (Hickton Decl. (ECF No. 305, Ex. B) ¶ 43.) ERAC-Pittsburgh argues that paragraph 43 contradicts Hickton's deposition testimony that he participated in management functions. There is no flatly contradictory factual discrepancy between the declaration and the cited testimony—participation by one person in certain managerial functions within a business does not mean that another person is not *ultimately* responsible for managing the business. ERAC-Pittsburgh also argues that this contradicts Hickton's affirmation during his deposition that a job application he submitted which stated that he was completely responsible for running the branch was accurate. The court notes, however, that the statement was made with respect to Hickton's entire tenure at ERAC-Pittsburgh, including the time period during which he was a branch manager, and is ambiguous with respect to his tenure as an assistant manager. When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents. See Lytle, 2009 WL 82483, at *2. To the extent the testimony is contradictory with respect to Hickton's tenure as a branch manager, that testimony

---

[3] Many other sample plaintiffs in this MDL submitted multiple declarations in opposition to the defendants' motions for summary judgment (some of which were completed prior to the sample plaintiffs' depositions), but the court could not locate an additional declaration by Hickton in the record. To the extent it exists, the court did not rely on it in deciding this motion for summary judgment, and any question about the propriety of relying on it to establish a genuine issue of material fact is therefore moot.

is immaterial for the purposes of this opinion, which relates only to Hickton's employment as an assistant manager. Paragraph 43 is not a sham.

Second, ERAC-Pittsburgh argues that portions of paragraph 46 of Hickton's declaration are inconsistent with his deposition testimony. ERAC-Pittsburgh takes issue with Hickton's statement that he did not set schedules for employees. (Hickton Decl. (ECF No. 305, Ex. B) ¶ 46.) The court was not presented with any deposition testimony in which Hickton stated that he set schedules for employees, and the portions of the deposition cited by ERAC-Pittsburgh were either not included in the excerpts they submitted to the court—for example, ERAC-Pittsburgh cites pages 94-95 of the deposition transcript which were not submitted to the court—or did not relate to the scheduling of employees. Paragraph 46 is not a sham.

Third, ERAC-Pittsburgh argues that portions of paragraph 47 of Hickton's declaration are inconsistent with his deposition testimony. Specifically, ERAC-Pittsburgh points to Hickton's declaration that he "was not responsible for apportioning work among the branch employees or for directing the work performed by branch employees." (Id. ¶ 47.) ERAC-Pittsburgh argues this testimony is contradictory because Hickton responded affirmatively that he "did have occasion to tell somebody what to do" although he did not delegate tasks. (Hickton Dep. (ECF No. 352-2) at 15.) Having opportunities to tell someone what to do is not factually the same thing as actually delegating and apportioning tasks. Hickton repeatedly testified during his deposition that he did not delegate tasks, and that directing employees was unnecessary because they already understood their roles and carried them out without oversight. Paragraph 47 is, therefore, consistent with his deposition testimony and is not a sham.

Fourth, ERAC-Pittsburgh argues that paragraph 12 of Hickton's declaration, in which he testified that he wrote between 200 and 250 rental tickets per month is a sham, because he

testified during his deposition that he could not recall how many rental tickets he wrote. The sham affidavit doctrine in this circuit, however, does not necessarily classify affidavits containing subsequent recollections of previously unrecalled facts as sham documents, especially when the affiant provides a satisfactory explanation for his subsequent recollection. Jiminez, 503 F.3d at 253. Here, in his declaration, Hickton indicates that he "always qualified for a monthly bonus based on the number of rental tickets [he] wrote as an [assistant manager]." (Hickton Decl. (ECF No. 305, Ex. B) ¶ 12.) The declaration is not flatly contradictory and Hickton's reference to his qualification for a bonus may provide the satisfactory explanation for his later recollection of facts previously not recalled. Paragraph 12 is, therefore, on its face, not a sham.

ERAC-Pittsburgh raises various other arguments in its supplemental briefing, most of which are directed at the arguments raised by counsel for Hickton in briefings filed with the court. Those challenges, however, do not fall within the ambit of the sham affidavit doctrine. To the extent the arguments were not supported by the record, the court would have disregarded them.

For the reasons set forth above, the court finds the challenged declaration statements not flatly contradictory of Hickton's deposition testimony, and concludes that Hickton's subsequent recollection of facts not previously recalled was satisfactorily explained. The declaration is, therefore, not a sham. The court notes that ERAC-Pittsburgh could not meet its substantial burden of proof on summary judgment even if the declaration was disregarded. Notably, most of the factual information contained in the first section of this memorandum opinion is derived from sources other than the challenged portions of the declaration. Even if the declaration was

stricken from the record, there would still be sufficient genuine disputes of material fact to preclude the court from entering summary judgment in ERAC-Pittsburgh's favor.

### B. Rule 26 Disclosures

Plaintiffs assert that statements submitted by defendants in support of the various motions for summary judgment were made in violation of Federal Rule of Civil Procedure 26. Defendants argue that they satisfied their Rule 26 obligations because the identities of the ERAC-Pittsburgh employees who made declarations ("declarants") were disclosed in the course of depositions.

A party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i). "A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E).

Under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

**(B)** as ordered by the court.

Rule 37(c) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless*." FED. R. CIV. P. 37(c) (emphasis added); see Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000).

Because the court is denying this motion for summary judgment, it need not rule on the propriety of the disclosures under Rule 26.   Instead, the discretionary application of Rule 37 sufficiently disposes of the issue, because, presuming defendants did violate Rule 26, the presumed violations would have been harmless.  The imposition of Rule 37 sanctions is within the discretion of this court.  Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir. 1995).  There are several factors which courts of appeals will consider in evaluating how this court exercises its discretion regarding Rule 37 sanctions.  In re TMI Litig., 193 F.3d 613, 721 (3d Cir. 1999).  This court will use those factors as a guide in applying its discretion. The factors are:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and
>
> (4) bad faith or willfulness in failing to comply with the district court's order.

18

Id. (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)).

Hickton was given the opportunity to pursue additional discovery of declarants before the court ruled on the motion for summary judgment and chose not to do so. (Tr. of Continued Arg. (ECF No. 807) at 117, July 25, 2011.) The only relief requested by plaintiffs in the briefing on this issue is a "request that the Court disregard the declarations of Defendants' witnesses provided after the close of the summary judgment discovery period." (Pl.'s Resp. to Defs.' Suppl. Br. on the Sufficiency of Disclosures (ECF No. 791) at 2.) There is no pending motion for sanctions. As the court explains *infra* in Section IV.C, genuinely disputed material facts compel a resolution of this motion in favor of Hickton. Thus, to the extent the court relied on declarants' testimony, the reliance was harmless, as the only relief requested by Hickton relates to the court's determination of this motion, on which Hickton ultimately prevailed.

Applying the TMI/Meyers factors, the court finds: first, there is no prejudice to Hickton, as explained above; second, Hickton had the opportunity to conduct further discovery with respect to declarants, but chose not to do so, and could have cured any perceived prejudice; third, efficient administration of this multidistrict litigation compels the court to resolve this summary judgment motion without further procedural delay or complicated wrangling of the record without purpose; and fourth, the court finds no bad faith on the part of ERAC-Pittsburgh. For these reasons, and all the reasons listed above, but primarily because the court is resolving the summary judgment in favor of Hickton, there is no need to disregard declarants' statements, as requested by Hickton.

### C. The FLSA Exemptions

19

*1. General Framework*

The FLSA exempts from its overtime provisions "any 'employee in a bona fide executive, administrative, or professional capacity.'" Soehnle v. Hess Corp., 399 F. App'x 749, 750 n.1 (3d Cir. 2010) (quoting 29 U.S.C. § 213(a)(1)). Additionally, the FLSA exempts from its overtime provisions "[e]mployees who perform a combination of exempt duties." 29 C.F.R. § 541.708.

In light of the broad remedial purpose of the FLSA,[4] exemptions are narrowly construed against the employer. Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir. 2000). An FLSA exemption is properly characterized as an affirmative defense. Id. at 180-81, 183. Thus, "[t]he burden of proof to establish that its employees come within the scope of an overtime exemption is on the employer." Friedrich v. U.S. Computer Serv., 974 F.2d 409, 412 (3d Cir. 1992). "[I]f the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991).

ERAC-Pittsburgh bears the burden of proving that Hickton was exempt from the overtime provisions of the FLSA. Id. In order for summary judgment to be granted, ERAC-Pittsburgh must establish all the essential elements of the exemption to the extent required by the summary judgment standard discussed above. If a reasonable jury could find that ERAC-Pittsburgh did not meet its burden with respect to just one element of the relevant exemption, it would be compelled to return a verdict in favor of Hickton as to that exemption. As such,

---

[4] "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987); see De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 373 (3d Cir. 2007); Sperling v. Hoffman-La Roche Inc., 862 F.2d 439, 446-47 (3d Cir. 1988) (relying on the FLSA's "broad remedial purpose" as a basis for a liberal construction of the statute in favor of potential plaintiffs).

summary judgment is inappropriate here unless there are no genuine issues as to material facts with respect to *any* of the elements of the exemption. Each exemption, however, is independently sufficient to provide the basis for judgment in favor of ERAC-Pittsburgh. See 29 U.S.C. § 213(a)(1) (providing that "any employee employed in a bona fide executive, administrative, *or* professional capacity" is exempt (emphasis added)). To prevail, ERAC-Pittsburgh must establish a lack of genuinely disputed material facts with respect to *all* the elements of at least one of the asserted exemptions.

The Secretary of Labor has statutory authority to publish FLSA regulations to aid courts in determining the scope of exemptions and has exercised that authority. 69 Fed. Reg. 22,121 (Apr. 23, 2004). Section 13(a)(1) of the FLSA provides that "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman *as such terms are defined and delimited from time to time by regulations of the Secretary*" is exempt. 29 U.S.C. § 213(a)(1) (emphasis added). Unlike prior regulations, the currently applicable 2004 regulations were adopted after notice and comment and fall within the ambit of the Secretary's legislative rule-making authority. 69 Fed. Reg. 22,121, 22,124 (Apr. 23, 2004). These regulations are, therefore, entitled to <u>Chevron</u> deference. See <u>Chevron USA v. Natural Res. Def. Council</u>, 467 U.S. 837 (1984); <u>Cash v. Cycle Craft Co., Inc.</u>, 508 F.3d 680, 683. (1st Cir. 2007).

Under the regulations, exempt work includes any work which is "directly and closely related to the performance of exempt work." 29 C.F.R. § 541.703. The regulations provide the following guidance:

> The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, "directly and closely related"

> work may include physical tasks and menial tasks that arise out of
> exempt duties, and the routine work without which the exempt
> employee's exempt work cannot be performed properly. Work
> "directly and closely related" to the performance of exempt duties
> may also include recordkeeping; monitoring and adjusting
> machinery; taking notes; using the computer to create documents
> or presentations; opening the mail for the purpose of reading it and
> making decisions; and using a photocopier or fax machine. Work
> is not "directly and closely related" if the work is remotely related
> or completely unrelated to exempt duties.

Id.  In a similar vein, "[o]ccasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees" are exempt when they are done as a means of performing an exempt task.  29 C.F.R. § 541.707.  The court should consider the following factors in determining whether occasional tasks are exempt: (1) "[w]hether the same work is performed by any of the exempt employee's subordinates"; (2) the "practicability of delegating the work to a nonexempt employee"; (3) "whether the exempt employee performs the task frequently or occasionally"; and (4) "existence of an industry practice for the exempt employee to perform the task." Id.

The executive, administrative and combination exemptions will be addressed in order.


*2.  The Executive Exemption*

An exempt "executive" is any employee:

> (1) Compensated on a salary basis at a rate of not less than $455
> per week . . . ;[5]
>
> (2) Whose primary duty is management of the enterprise in which
> the employee is employed or of a customarily recognized
> department or subdivision thereof;

---

[5] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).


*(a)  Management as Primary Duty*

The regulations provide a nonexhaustive list of "management" duties.  29 C.F.R. § 541.102.[6]  An employee may concurrently perform nonexempt duties and still qualify for the executive exemption as long as the requirements of § 541.100 (including the primary duty requirement) are otherwise satisfied.  Id. § 541.106.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a); see Reich v. Wyoming, 993 F.2d 739 742 (10th Cir. 1993) (providing that the employee's primary duty is that which is of principal importance to his or her employer); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir.

---

[6] Section 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

1982) (finding assistant manager's primary duty to be that which is most critical or important to success of the business).   Thus, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  The regulations identify four nonexhaustive factors to consider when determining an employee's primary duty, including:

> (1) "the relative importance of the exempt duties as compared with other types of duties;"
>
> (2) "the amount of time spent performing exempt work;"
>
> (3) "the employee's relative freedom from direct supervision; and"
>
> (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

Id.  The amount of time spent in the performance of exempt work may be a useful guide in determining whether exempt work is an employee's primary duty.  Id.  Employees who spend more than half of their time on exempt work generally satisfy the primary duty requirement.  Id. The regulations caution, however, against blind adherence to a time-based analysis, as time spent on exempt work is only one of the four nonexhaustive factors to consider.  Id.[7]

Each of the four factors will be considered in order.

---

[7] The regulations provide the following example of the application of the primary duty analysis:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

First, with respect to the relative importance of exempt duties, a jury could reasonably determine that Hickton's limited exempt duties were much less important than his nonexempt duties. Among Hickton's exempt executive duties were his role training employees, supervising employees, providing informal evaluations about employees to his superiors and informally warning employees who were tardy. A jury could reasonably conclude, based upon Hickton's testimony, that these obligations were not nearly as important to ERAC-Pittsburgh as Hickton's responsibilities in performing labor-intensive and sales-related functions at the branch. Those labor-intensive and inside-sales tasks (which are nonexempt) were vital to the success of his branch, whereas Hickton's testimony, which must be viewed in his favor, establishes that his role as a supervisor or a trainer was not as important—the employees were self-sufficient and capable of doing their jobs without any meaningful oversight. Employees' job responsibilities were controlled by company or branch policies that Hickton did not create. Hickton's testimony also shows that he referred matters to his superiors at ERAC-Pittsburgh when they were important issues, or if policy did not clearly dictate a particular outcome. It is reasonable, after resolving factual disputes in favor of Hickton, to conclude that Hickton's most important purpose was to complete the menial or sales tasks necessary to rent cars to customers. This conclusion is bolstered by the substantial evidence in the record that Hickton's managerial roles were limited and involved mostly unimportant decisions. The first factor weighs against the conclusion that Hickton's primary duty was management.

Second, regarding the amount of time spent on exempt work, reasonable inferences from Hickton's testimony lead to the conclusion that he spent the majority of his time on nonexempt tasks such as working at the rental counter. He testified that he spent substantial amounts of time on nonexempt tasks, including writing tickets, washing cars and moving cars. He testified that

his primary responsibility was sales. He further testified that he did not spend any time directing employees at the branch or delegating tasks, because the employees essentially operated according to policy without any oversight. A reasonable jury could find Hickton's self-evaluation breakdown of his time to lack much persuasive weight because the amounts added up to substantially more than one-hundred percent. The second factor weighs against the conclusion that Hickton's primary duty was management.

Third, with respect to freedom from supervision, Hickton's testimony indicated that his branch manager was usually present at the branch and he relied on supervisors whenever an important issue arose; even when his branch manager was absent, he called to obtain guidance on important decisions. He testified that the branch manager set the schedule and established policies which controlled how the branch was operated. He testified that difficult decisions were referred to his superiors, and his work was primarily dictated by pre-established policies from which he did not deviate. Freedom from supervision includes the concept of independent discretion. Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1270 n.57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision. . . . Thus, the . . . regulations . . . are consistent with[] our consideration of the frequency with which an employee exercises discretionary powers in our primary duty analysis."). There is little, if any, uncontradicted evidence in the record showing that Hickton exercised discretion in any matters at the airport branch. The third factor weighs against the conclusion that Hickton's primary duty was management.

Fourth, the court must consider Hickton's wage in relation to nonexempt employees. Because the undisputed facts establish that Hickton earned substantially more than the

nonexempt employees working at the airport branch, the court concludes that the fourth factor weighs in favor of the conclusion that Hickton's primary duty was management.

Because the court concludes that, when viewing the facts in the light most favorable to Hickton, three of the four primary duty factors collectively could be found in his favor, it is for a jury to determine whether his primary duty was management. A reasonable jury could conclude that Hickton's nonexempt tasks—like writing rental tickets, cleaning cars, and moving cars— were his duties of principal importance to ERAC-Pittsburgh, see Reich v. Wyoming 993 F.2d 739, 742 (10th Cir. 1993), and were most critical or important to the success of ERAC-Pittsburgh, see Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982). A jury could reasonably credit Hickton's testimony that his primary role was sales. This conclusion is supported by Hickton's testimony that the nonexempt tasks he *did* perform were largely unimportant, noncritical functions, many of which were shared with nonexempt employees.

### (b) Customarily and Regularly Directs Work of Two or More Employees

To qualify under the executive exemption, an employee must customarily and regularly direct the work of two or more other employees, or their equivalent. 29 C.F.R. §§ 541.100(a)(3), 541.104(a). According to the regulations:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement." Id. § 541.104(c).

27

ERAC-Pittsburgh did not meet its burden to demonstrate that, as a matter of law, Hickton customarily and regularly directed the work of two or more full time employees. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement." Id. Accepting as true Hickton's deposition testimony, Hickton's branch manager was responsible for directing the ERAC-Pittsburgh employees, setting policies and setting the work schedule. Hickton explicitly denied that he ever directed other employees or delegated to other employees, and the court must credit those statements.

A reasonable jury could conclude that Hickton only supervised other employees in the branch when the branch manager was not present, based on the testimony that the branch manager oversaw all but the most mundane decisions, and that Hickton relied on the branch manager to make important decisions not dictated by policy, which included calling the branch manager during the evening shift if a difficult situation arose. The court concludes that ERAC-Pittsburgh failed to meet its burden to satisfy this factor of the executive exemption because a reasonable jury could conclude that Hickton "merely assist[ed] the manager … and supervise[d] . . . only in the actual manager's absence." 29 C.F.R. § 541.104(c).

### (c)  Authority to Hire, Fire, or Effect Some "Other Change of Status"

In order to qualify as an exempt executive, an employee must have authority to hire or fire other employees, or have particular weight given to his or her suggestions and recommendations regarding hiring, firing, promotion, advancement or other changes of status. 29 C.F.R. § 541.100(a)(4). "[O]ther change of status" means any "tangible employment action" as that term is commonly used under Title VII, such as "reassignment with significantly different

responsibilities." 69 Fed. Reg. 22,122, 22,131 (Apr. 23, 2004). In the Title VII context, the Supreme Court has defined "tangible employment action [to] constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Pa. State Police v. Suders, 542 U.S. 129, 144 (2004). "A tangible employment action in most cases inflicts direct economic harm." Burlington Indus., 524 U.S. at 762.

To determine whether an employee's suggestions and recommendations are given "particular weight," it is not required that the employee have final authority regarding any of the above-listed changes in employment status. 29 C.F.R. § 541.105. Instead, courts should consider whether making suggestions is part of the employee's job description or duties, whether suggestions are made or requested frequently, and whether they are frequently relied upon. Id.; see Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (finding crew leaders of chicken catchers to be nonexempt when they could not hire or fire employees, but had limited authority to borrow workers from other crews, and made referrals to their employer regarding prospective employees). Although the record reflects that on one occasion Hickton participated in the reassignment decision of one employee, there is no evidence to suggest that reassignment rises to the level of a "tangible employment action" because there is no reason to believe the reassignment was accompanied by any meaningful change in responsibilities or benefits.

There are genuine issues of fact with respect to this element of ERAC-Pittsburgh's affirmative defense which preclude summary judgment. Hickton testified he was not responsible for the hiring, firing, advancement, promotion or other changes in the status of branch employees. The record shows that Hickton neither meaningfully participated in nor made

material suggestions with respect to hiring, firing, advancement, promotion or other material changes of status. He testified he did not discipline employees, except in a few informal situations which were limited to providing feedback to the employees, and Hickton was not involved in any decision making about whether to take disciplinary action.

With respect to particular weight, the court must consider whether suggesting employment actions is part of the employee's job description or duties, whether suggestions are frequently made or requested, and whether they are frequently relied upon. 29 C.F.R. § 541.105; Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006). There are genuine disputes with respect to this component. Although testimony of ERAC-Pittsburgh employees indicates that Hickton was expected to participate and did participate in these kinds of decisions, his own testimony indicates that he did not have sufficient involvement. In resolving the dispute, the court must credit the testimony of Hickton. Because he testified that he had no involvement in hiring, firing, promotional, reassignment and termination decisions, a reasonable jury could conclude he did not make recommendations which were given particular weight.

ERAC-Pittsburgh's attempt to argue that Hickton's involvement in disciplinary situations is sufficient to meet this element is unavailing. Providing informal feedback, unlike formal reprimands or unsatisfactory job evaluations, does not reach the level necessary to meet the requirements of this element of the executive exemption. Similarly, Hickton's informal conversations with his branch manager about employees are insufficient proof of the "particular weight" requirement, because a reasonable jury could conclude his involvement in the actual hiring, firing, and advancement process was so minimal that it is apparent he was not actually involved in making the decision in a meaningful way. See Davis v. Mountaire Farms, Inc., 453 F.3d at 558 (holding that making referrals was not substantial enough involvement). Penrod

most likely relied on Hickton as a source of information, but that does not mean Hickton actually made *suggestions* about personnel decisions, which were given any weight, because Penrod talked to all ERAC-Pittsburgh employees to obtain information about the airport branch and its employees.

Because there are material facts in dispute with respect to three of the four elements of the executive exemption, ERAC-Pittsburgh failed to meet its burden and summary judgment cannot be granted on the basis of the executive exemption.

### 3. The Administrative Exemption

An exempt "administrative" employee is any employee:

(1) Compensated on a salary or fee basis at a rate not less than $455 per week[8] . . . ;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

### (a) Primary Duty of Management or Business Related Office Work

Under the administrative exemption, an employee's "primary duty"[9] must consist of performing office or nonmanual work directly related to the management and general business

---

[8] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.
[9] See supra, Section IV.C.2.a, for a discussion of the term "primary duty."

operations of the employer.  29 C.F.R. § 541.200(a)(2).  Section 541.201(b) provides examples

of "[w]ork directly related to management or general business operations":

> Work directly related to management or general business
> operations includes, but is not limited to, work in functional areas
> such as tax; finance; accounting; budgeting; auditing; insurance;
> quality control; purchasing; procurement; advertising; marketing;
> research; safety and health; personnel management; human
> resources; employee benefits; labor relations; public relations;
> government relations; computer network, internet and database
> administration; legal and regulatory compliance; and similar
> activities. Some of these activities may be performed by employees
> who also would qualify for another exemption.

29 C.F.R. § 541.201(b).

In order for work to be "directly related to the management or general business

operations," it must be "directly related to assisting with the running or servicing of the business,

as distinguished, for example, from working on a manufacturing production line or selling a

product in a retail or service establishment."  Id. § 541.201(a).  The concept of a "production

worker" is not limited to individuals involved in the manufacture of tangibles.  Martin v. Cooper

Elec. Supply Co., 940 F.2d 896, 903-04 (3d Cir. 1991).  For example, in Martin v. Cooper, the

Court of Appeals for the Third Circuit held inside[10] salespersons of electrical products to be

production, rather than administrative, employees.  Id. at 903.

The administrative/production dichotomy turns on whether the services or goods

provided by the employee constitute the marketplace offerings of the employer, or whether they

contribute to the running of the business itself.  Bothell v. Phase Metrics, Inc., 299 F.3d 1120,

1127 (9th Cir. 2002).  Thus, context matters: an underwriter at a department store who decides

whether to issue credit to consumers "performs a support function auxiliary to the department

---

[10] An "inside" salesperson is an employee who makes sales inside his or her place of business, which contrasts with
the outside salesperson, exempt under the FLSA, who must be "customarily and regularly engaged away from the
employer's place of business."  29 C.F.R. § 541.500.

store's primary function of selling clothes"; whereas, an underwriter for a large bank "is directly engaged in creating the 'goods'—loans and other financial services—produced and sold by [the bank]." Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009). Courts distinguish exempt administrative employees from nonexempt production employees who perform administrative tasks by determining whether the employees are engaged in the "running of the business and not merely . . . the day-to-day carrying out of its affairs." Bratt v. Cnty. of Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990).

ERAC-Pittsburgh argues that Hickton was involved in many of the activities expressly identified in § 541.201(b), including finance, marketing, safety and health, personnel management, human resources, public relations and legal and regulatory compliance. (Mem. Supp. Def. Enterprise Rent-A-Car Company of Pittsburgh's Mot. Summ. J. as to Pl. Nicholas Hickton ("ERAC-Pittsburgh Br.") (ECF No. 347) at 27.) ERAC-Pittsburgh also argues that his fleet management responsibilities were administrative without specifically identifying which of the § 541.201(b) categories that work would fall under. (Id.) Hickton argues that his office responsibilities were not sufficiently important to ERAC-Pittsburgh and were merely the carrying out of its daily affairs.

To the extent ERAC-Pittsburgh points to specific administrative job duties performed by Hickton, many of those duties were nonexempt. For example, ERAC-Pittsburgh argues that Hickton's marketing and sales calls to customers and prospective customers were administrative tasks relating to marketing. For a variety of reasons, the court is not persuaded that such actions, even if they were Hickton's primary duty, would qualify as administrative under the regulations. Making sales calls and salesmanship (which are distinct from marketing) are not listed as examples of exempt areas of work in § 541.201(b). Inside sales are production tasks, and the

regulations provide a separate exemption for outside sales employees, which ERAC-Pittsburgh did not raise as a distinct defense in this motion for summary judgment (but only as a component of the combination exemption).

With respect to ERAC-Pittsburgh's argument that Hickton's responsibilities in fleet management constituted administrative work, the tasks ERAC-Pittsburgh points to are not administrative because they do not amount to the running of the business; they are, rather, merely the carrying out of its day-to-day affairs. Hickton's testimony established that his role in fleet management was minor, and that his branch manager was individually responsible for maintaining the proper mix of vehicles in the fleet. Hickton's fleet management responsibilities (including washing cars, for example) amounted to participation in the production of ERAC-Pittsburgh's marketplace offering—rental cars—as opposed to performance of an auxiliary task directly related to the management of the business. See 29 C.F.R. § 541.201(a); Davis, 587 F.3d at 535; Bothell, 299 F.3d at 1127; Bratt, 912 F.2d at 1070.

With respect to other tasks which ERAC-Pittsburgh argues were administrative, there are genuine disputes about whether Hickton performed those duties, the frequency of performance, and what the performance actually entailed. These disputes include Hickton's responsibilities in human resources and personnel management. As discussed above with respect to the executive exemption, the court must accept Hickton's testimony that his role in those tasks was limited, and that he generally did not participate in a meaningful way in running the ERAC-Pittsburgh branches with respect to those aspects of the business.

More importantly, there is insufficient evidence to determine as a matter of law that the arguably administrative tasks performed by Hickton constituted his "primary duty." It is not the province of this court on a motion for summary judgment to weigh the evidence in the record.

The court cannot ignore the reasonable inference that Hickton spent the majority of his time on sales and manual labor, and the court cannot disregard the testimony of Hickton that his primary responsibility in terms of importance to ERAC-Pittsburgh was sales. Inside sales tasks and physical tasks are not within the ambit of the administrative exemption. Martin v. Cooper, 940 F.2d at 903-06. Inside salespeople may be production employees. Id. ERAC-Pittsburgh did not meet its burden of proving that Hickton's primary duty was management– or business-related office or nonmanual work.

*(b) Discretion and Independent Judgment and Matters of Significance*

To fall within the administrative exemption, an employee must "exercise . . . discretion and independent judgment with respect to matters of significance" as part of his or her primary duty. 29 C.F.R. § 541.200(a)(3). The regulations consider the exercise of discretion and independent judgment to involve evaluation of options and subsequent decisionmaking. Id. § 541.202(a). Courts should determine whether an employee exercises discretion and independent judgment "in . . . light of all the facts involved in the particular employment situation in which the question arises." Id. § 541.202(b). When determining whether an employee exercises discretion and independent judgment with respect to matters of significance, courts should consider the following nonexhaustive list of factors:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate

35

from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id.

The FLSA "discretion and independent judgment" requirement can be satisfied even if the employee's decisions are reviewed or changed by a superior. "[T]he term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review," but the employee's decisions "may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). For that reason, "[t]he fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." Id. Employees can exercise discretion and independent judgment even when their recommendations are subject to review. Id.; accord Paul v. UPMC Health Sys., No. 09-1565, 2009 WL 699943, at *12 (W.D. Pa. Mar. 10, 2009). Carrying out clerical duties, on the other hand, is not sufficient for administrative exemption, even if the duties involve a small amount of discretion. See Goldstein v. Dabanian, 291 F.2d 208, 210-11 (3d Cir. 1961) (holding that employees, whose duties included cashing checks, accepting payments and issuing money orders, were not within the administrative exemption).

Here, ERAC-Pittsburgh did not specifically address the factors enumerated in 29 C.F.R. § 541.202(b). ERAC-Pittsburgh instead argued generally that when Hickton participated in fleet

36

management, resolved customer complaints, implemented marketing strategy, participated in personnel decisions and determined which customers could rent cars, he was required to exercise independent judgment and discretion. (ERAC-Pittsburgh Br. (ECF No. 347) at 30.) There are genuine disputes about whether Hickton actually carried out several of these duties in a meaningful way. For example, he testified that he did not have any responsibility for maintaining the proper mix of vehicles in the airport branch's fleet. He testified that all important decisions were either controlled by policy or were referred to his branch manager; Hickton did not participate in setting branch policies. None of the tasks proffered by ERAC-Pittsburgh reach the level of importance or consequence contemplated by the regulations as necessary to qualify an employee for the administrative exemption. Section 541.202(b) gives examples of the kinds of questions a court should consider in this analysis, and suggests that the term "matters of significance" is a context-specific determination which "must be applied in the light of all the facts involved in the particular employment situation." 29 C.F.R. § 541.202(b). It refers to "major assignments," "matters that have significant financial impact," and establishing policies and objectives for the company. Id. Hickton was bound by company policy in almost all matters beyond the most mundane, and did not deviate from policy. Whenever he was presented with a discretionary or difficult decision, he was subject to the direction and approval of the branch manager. The record reflects that Hickton deferred to superiors when he was presented with a difficult situation. Merely because he could damage the business if he made a mistake or acted recklessly in his duties does not establish that he has the requisite discretion to meet the administrative exemption. 29 C.F.R. § 541.202(f) ("An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.").

Resolving factual disputes in favor of Hickton's testimony, the court finds that a reasonable jury could conclude that none of the enumerated factors listed in 29 C.F.R. § 541.200(a)(3) were proven. There are material facts in genuine dispute regarding both Hickton's independence and his discretion.

For the reasons stated above, the court finds that there are genuine disputes with respect to material facts in two of the three § 541.200(a) elements of the administrative exemption. Because ERAC-Pittsburgh has the burden of proving each element of the exemption, these genuine disputes preclude summary judgment on the basis of the administrative exemption.

### 4. The Combination Exemption

Under the FLSA regulations, an employee who performs a combination of exempt duties—but who does not satisfy the primary duty requirement under any of the stand-alone exemptions—may nonetheless qualify for exempt status. 29 C.F.R. § 541.708. "[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption" so long as the other requirements, such as the salary basis test, are met. Id.; accord IntraComm, Inc. v. Baja, 492 F.3d 285, 292-95 (4th Cir. 2007) (deferring to the Secretary of Labor's interpretation that "the combination exemption provides a mechanism for cobbling together different exempt duties for the purposes of meeting the primary-duty test" but "does not . . . relieve employers of their burden to independently establish the other requirements of each exemption whose duties are combined"). The primary thrust of the combination exemption, therefore, is merely that the performance of exempt executive work cannot be the basis for preventing an otherwise exempt administrative employee from being

exempted because his primary duty is blended between executive and administrative work and vice versa.  Id.

The court's determination that a reasonable jury could conclude nonexempt tasks involving sales and manual labor constituted Hickton's primary duty preclude summary judgment on the basis of the combination exemption.

Conclusively, because ERAC-Pittsburgh did not meet its burden with respect to other necessary elements of both the administrative and the executive exemptions—beyond merely failing to establish the primary duty element—the combination exemption is inapplicable to Hickton.  See IntraComm, Inc. 492 F.3d at 292-95.   Thus, the court cannot grant ERAC-Pittsburgh's motion for summary judgment on the basis of the combination exemption, even if his primary duty were found to be some combination of exempt administrative and executive tasks.

## *VI. Conclusion*

For the reasons set forth in this memorandum opinion, because ERAC-Pittsburgh did not prove as a matter of law *all* the elements of at least one of the exemptions, and in consideration of the relevant summary judgment standard and the narrowly construed FLSA exemptions, ERAC-Pittsburgh's motion for summary judgment against sample plaintiff Nicholas Hickton (ECF No. 346) will be denied.  Summary judgment is precluded by the abundance of disputed material facts regarding Hickton's job responsibilities—especially relating to Hickton's authority to hire, fire or effect some other change in employees' status (with respect to the executive exemption) and his discretion and independent judgment in matters of importance (with respect

to the administrative exemption)—on which the court must defer to future resolution by a jury.[11]

An order will follow.

By the court,

  /s/ Joy Flowers Conti
Hon. Joy Flowers Conti
United States District Judge

Date:   September 24, 2012

---

[11] ERAC-Pittsburgh also raised analogous exemption defenses to Hickton's state law overtime claims in its motion, but did not independently address the state law issues. Instead, ERAC-Pittsburgh noted in a footnote that the state exemptions are "substantially equivalent" to the federal exemptions. (ERAC-Pittsburgh Br. (ECF No. 347) at 31 n.14.) Based on that concession, the court will deny the motion for summary judgment with respect to ERAC-Pittsburgh's state law defenses, in addition to the FLSA defenses, for the same reasons it denied the motion with respect to the FLSA defenses, which are set forth in this memorandum opinion.